IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-CV-468-D

DEMETRIUS BENSON, )
JABRIL MUHAMMAD, )
and TERRANCE FOSTER, )
 )
        Plaintiffs, )
 )
v. ) **ORDER**
 )
VAUGHN INDUSTRIES LLC, )
 )
        Defendant. )

On September 27, 2018, Demetrius Benson, Jabril Muhammad, and Terrance Foster (collectively, "plaintiffs") filed a complaint against Vaughn Industries, LLC ("Vaughn," or "defendant") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., and 42 U.S.C. § 1981 alleging race discrimination and retaliation. See Compl. [D.E. 1]. On June 20, 2019, Vaughn moved for summary judgment [D.E. 20, 21, 26, 27]. On July 5, 2019, plaintiffs responded in opposition [D.E. 22, 23, 24]. On October 2, 2019, Vaughn replied [D.E. 33]. As explained below, the court grants Vaughn's motion for summary judgment.

I.

Vaughn is an electrical construction contractor based in Carey, Ohio, with an office and warehouse in Wilson, North Carolina. See Tschanen Aff. [D.E. 27-1] ¶ 1.[1] In 2016, Vaughn began

---

[1] Plaintiffs object that Vaughn did not file a statement of material facts with its motion for summary judgment. See [D.E. 24] 3–5. In accordance with this court's local rules, Vaughn should have filed a statement of material facts. Nonetheless, Vaughn did file all the evidence that it relies on with its motion for summary judgment and included a detailed statement of facts in its memorandum of law in support of its motion for summary judgment with record citations. See [D.E. 21, 21-1]. Moreover, after Vaughn realized its oversight, it immediately sought to remedy it. See

a project in Wilson to build eight solar fields (the "Wilson Project"). See id. In order to staff the Wilson Project, Vaughn retained Mobile Construction Mechanics ("MCM"), Spencer Ogden, Inc. ("Spencer Ogden"), and other temporary employment agencies. See Blair Aff. [D.E. 27-2] ¶ 1; Tschanen Aff. ¶ 3. In order to help Vaughn staff the Wilson Project, MCM hired Demetrius Benson ("Benson") and Jabril Muhammad ("Muhammad"), and Spencer Ogden hired Terrance Foster ("Foster"). See Benson Dep. [D.E. 27-3] 12–13;[2] Muhammad Dep. [D.E. 27-4] 7; Foster Dep. [D.E. 27-5] 8. On September 13, 2016, plaintiffs, all African-American males, began their work as journeyman electricians on the Wilson Project. See Benson Dep. at 13; Muhammad Dep. at 7; Foster Dep. at 8; Blair Aff. ¶ 2. Plaintiffs were not Vaughn employees, but rather three of the 500 temporary workers hired to help Vaughn complete the Wilson Project. See Blair Aff. ¶ 2; Tschanen Aff. ¶ 3.

Benson became a Quality Control ("QC") Lead shortly after beginning work on the Wilson Project. See Benson Dep. at 15. Benson also supervised electricians on site and reported to Mike Savage, a Vaughn project scheduler. See id.; Tschanen Aff. ¶ 7. Savage made an "unofficial" suggestion to Benson that Benson might have an opportunity to become a QC Supervisor for Vaughn. See Benson Dep. at 15–16. Savage did not mention the position's pay or benefits, but told Benson that he would initiate the hiring process at Vaughn for Benson. See id. at 16. Benson did not see any paperwork concerning the position and never applied to Vaughn for the position. See

---

[D.E. 25]. On September 26, 2019, the court granted Vaughn leave to file a statement of material facts [D.E. 32]. Accordingly, Vaughn's initial failure to file a statement of material facts does not preclude the court from considering Vaughn's motion for summary judgment.

[2] The deposition citations are to the CM/ECF page. CM/ECF erroneously labels Benson's deposition as "Deposition of Demetrius Brown." [D.E. 27-3]. It should state "Deposition of Demetrius Benson."

2

id. After Savage spoke with Benson about the QC Supervisor opportunity, Benson went on vacation for a week. See id. When Benson returned from vacation, Benson learned that Vaughn had just hired Tim Rice ("Rice") as QC Supervisor. See id.; Blair Aff. ¶ 4.

On November 15, 2016, Vaughn hired Rice as QC Supervisor. See Blair Aff. ¶ 4. Savage told Benson that he had presented Benson's name to Savage's supervisors, but that they had decided to go in "a different direction." Benson Dep. at 16. The QC Supervisor job description included the requirement that the applicant have the "ability to supervise and manage complex construction projects and crews as assigned." Tschanen Aff., Ex. B. at 10. Brian Tschanen ("Tschanen"), Division Manager for Vaughn's Wilson Project, hired Rice "due to his extensive experience in installation, maintenance, operation, and inspection in the energy industry." Tschanen Aff. ¶ 8. Benson never applied for the QC Supervisor position or interviewed for it. See Benson Dep. at 17; Upchurch Dec. [D.E. 27-6] ¶ 7.³ Before hiring Rice, Tschanen did not consider Benson for the QC Supervisor position, and heard from Savage only that Benson was interested in a full-time position with Vaughn. See Tschanen Aff. ¶ 8. Savage did not present Benson to Tschanen as a candidate for the QC Supervisor position. See id.

On November 16, 2016, Scott Dawson ("Dawson"), a Wilson Project foreman, received a complaint that Rice had made racist and homophobic comments when giving instructions to employees. See id. at ¶ 9; Upchurch Dec. ¶ 4. Brenda Upchurch ("Upchurch"), Human Resources Coordinator for Vaughn in Wilson, investigated the complaint and obtained statements from ten people who heard Rice's comments, including plaintiffs. See Upchurch Dec. ¶ 4; Blair Aff. ¶¶ 5–6. JoAnn Blair ("Blair"), Human Resources Manager for Vaughn, reviewed the statements, spoke to

---

³ CM/ECF erroneously labels Upchurch's declaration as "Deposition of Brenda Upchurch." [D.E. 27-6]. It should state "Declaration of Brenda Upchurch."

3

Upchurch, and recommended to Tschanen that Vaughn terminate Rice's employment for violating Vaughn's equal employment and anti-harassment policy. See Blair Aff. ¶ 7; Tschanen Aff. ¶ 9; Upchurch Dec. ¶ 4. On November 18, 2016, Vaughn terminated Rice's employment. See Blair Aff. ¶ 7; Upchurch Dec. ¶ 5.

After Rice's termination, Vaughn did not seek to hire or promote anyone to fill the QC Supervisor position. See Tschanen Aff. ¶ 10. Initially, Savage assumed the responsibilities of the QC Supervisor position, and then Dan Carmean, a Vaughn employee since October 2012 who had QC and supervisory experience, assumed the responsibilities. See id. On February 6, 2017, Vaughn formally promoted Carmean to QC Supervisor and increased his pay. See id.; Blair Aff., Ex. B at 13.

Plaintiffs continued to work on the Wilson Project after Rice's termination. See Benson Dep. at 21; Muhammad Dep. at 11; Foster Dep. at 12–13. Benson and Muhammad claim that their responsibilities changed in late December 2017 from working on the Wilson Project in the field to warehouse work, but admit that their pay and benefits did not change. See Benson Dep. at 21; Muhammad Dep. at 11–12.

On January 5, 2017, Tschanen submitted to Upchurch a list of 47 temporary employees for termination because of a manpower reduction on the Wilson Project. See Tschanen Aff. ¶¶ 5–6; Tschanen Aff., Exs. at 6; Upchurch Dec. ¶ 8; Upchurch Dec., Exs. at 17–19. The list of 47 temporary employees included plaintiffs. See Tschanen Aff. ¶ 5. Tschanen developed the list of 47 temporary employees based on input from crew leaders concerning temporary employee "work performance, skill set, attendance, and overall contribution to the work site." Id. These layoffs were part of Vaughn's larger wind down of the Wilson Project, with Vaughn terminating a total of 85 temporary employees in the months before plaintiffs' termination. See Tschanen Aff. ¶ 4; Blair Aff.

4

¶ 9. Specifically, Vaughn terminated 22 temporary employees on November 22, 2016, 24 temporary employees between December 5–7, 2016, and 39 more temporary employees by the end of December 2016. See Tschanen Aff. ¶ 4; Blair Aff. ¶ 9.

On January 6, 2017, Upchurch emailed MCM and Spencer Ogden that plaintiffs and five other temporary workers were to be terminated due to manpower reductions. See Upchurch Dec. ¶ 9; Blair Aff. ¶ 11. Upchurch's email at 3:04 PM stated:

> \*\*Due to manpower cutbacks, please release the following IMMEDIATELY\*\*
>
> They are NOT onsite today
>
> Please let me know when you have contacted them, please advise them NOT to call nor return to VI sites.

Upchurch Dec., Exs. at 21–22. At 3:47 PM on that same date, Jason Herceg of MCM replied that Benson and Muhammad were on site and had been working in the warehouse all week. See id.; Benson Dep. at 22. At 5:56 PM on that same date, Upchurch responded: "Jason . . . I am so sorry . . . I didn't know they were working at the warehouse . . . . these two were totally my fault, I didn't know they were there." Id. at 21. Before sending her email at 3:04 PM, Upchurch did not see that Benson and Muhammad logged in on the time system and assumed they were not on site. See Upchurch Dec. ¶ 9. According to Upchurch, "[t]heir presence or absence at work was immaterial as they had been included on the list of manpower reductions that was provided to me on January 4 [, 2017]." Id. On January 6, 2017, the temporary agencies terminated the 47 employees on the list, including the plaintiffs. See Tschanen Aff. ¶¶ 5–6 ; Upchurch Dec. ¶ 9; see also Benson Dep. at 22; Muhammad Dep. at 10–11; Foster Dep. at 13.

On January 6, 2017, Benson and Muhammad received notice of their terminations from MCM, who initially told them it was because they were not at work. See Benson Dep. at 22;

5

Muhammad Dep. at 10. Benson and Muhammad took photos of their time sheets and warehouse equipment for MCM to demonstrate that they were at work on January 6, 2017. See Benson Dep. at 22; Muhammad Dep. at 10. MCM replied that Benson and Muhammad had already been terminated and that they had to leave the Wilson Project work site. See Benson Dep. at 22; Muhammad Dep. at 10. Benson and Muhammad then went to the main office of Vaughn's Wilson Project work site to ask about their termination and to get copies of their statements concerning Rice. See Benson Dep. at 22; Muhammad Dep. at 10–11. Vaughn did not give Benson or Muhammad copies of their statements and a person at the office told them that she was going to call the police if they did not leave the work site. See Benson Dep. at 22.

## II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S.

at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

III.

Title VII prohibits an employer from taking adverse employment action against an employee "because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII violation in two ways. First, a plaintiff can show through direct evidence that racial discrimination motivated an employer's adverse employment action. See, e.g., Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). If a plaintiff lacks direct evidence (as in this case), a plaintiff can alternatively proceed under the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973); see Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013).

"The McDonnell Douglas framework is comprised of three steps: (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is

7

discriminatory or retaliatory." Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 216 (4th Cir. 2016). The McDonnell Douglas framework applies to failure to promote, failure to hire, termination, and retaliation claims under Title VII and section 1981. See, e.g., Williams v. Giant Food Inc., 370 F.3d 423, 430 (4th Cir. 2004); Beall v. Abbott Labs, 130 F.3d 614, 619 (4th Cir. 1997), abrogated in part on other grounds by Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134 (4th Cir. 2007).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted); see Reeves, 530 U.S. at 147.

In analyzing the record concerning pretext, the court does not sit to decide whether the employer in fact discriminated against the plaintiff on the basis of race. See, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279–80 (4th Cir. 2000). Rather, the court focuses on whether the plaintiff has raised a genuine issue of material fact as to pretext under Reeves and its Fourth Circuit progeny. Under Reeves and

8

its Fourth Circuit progeny, a plaintiff may not "simply show the articulated reason is false; he must also show that the employer discriminated against him on the basis of [race]." Laber v. Harvey, 438 F.3d 404, 430–31 (4th Cir. 2006) (en banc). In certain cases, however, the factfinder may infer illegal discrimination from the articulated reason's falsity. See id. at 431; Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000).

A.

Benson alleges that Vaughn failed to promote him to QC Supervisor based on his race. See Compl. ¶¶ 31–40.[4] In support, Benson contends that Vaughn did not promote him to QC Supervisor in favor of Tim Rice (who is white), and then in favor of Tim Carmean (who is also white). See id. at ¶¶ 13–14, 22.[5] To establish a prima facie case of failure to promote based on race, a plaintiff must show that: "(1) [he] is a member of a protected group, (2) there was a specific position for which [he] applied, (3) [he] was qualified for that position, and (4) [the defendant] rejected [his] application under circumstances that give rise to an inference of discrimination." Williams, 370 F.3d at 430; see McDonnell, 411 U.S. at 802; Anderson, 406 F.3d at 268.

Benson meets the first two elements of his prima facie case. As for the first element, Benson

---

[4] Plaintiffs assert claims under Title VII and 42 U.S.C. § 1981. Because the analysis of the claims under both statutes is the same, the court analyzes the respective Title VII and section 1981 claims together. See, e.g., Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004); Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 545 n.3 (4th Cir. 2003).

[5] Under Title VII, Benson's failure-to-promote claim is limited to non-promotions occurring within 180 days of filing his EEOC charge on June 30, 2017. See 42 U.S.C. § 2000e–5(e)(1); Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002). Accordingly, the court dismisses Benson's Title VII failure-to-promote claim concerning the Rice promotion as untimely. See Morgan, 536 U.S. at 114–15; Williams, 370 F.3d at 429; McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 606 n.3 (E.D.N.C. 20006). The court, however, analyzes Benson's race-based failure-to-promote claim concerning Rice and Carmean under section 1981. Those claims are subject to a four-year statute of limitations. See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004); McDougal-Wilson, 427 F. Supp. 2d at 606 n.3.

9

is an African American, and thus a member of a protected class. See Blair Dec. ¶ 6. As for the second element, in cases where the employers does not have a formal application process for a position, the application requirement is relaxed. Williams, 370 F.3d at 431; see Box v. A&P Tea Co., 772 F.2d 1372, 1377 (7th Cir. 1985); McDougal-Wilson, 427 F. Supp. 2d at 606. Thus, viewing the evidence in the light most favorable to Benson, Benson meets the second element of his prima facie case. See Benson Dep. at 16; Tschanen Aff. ¶ 8.

As for the third element, in analyzing an employee's qualifications, it is the perception of the decisionmaker that is relevant, not the employee. See King, 328 F.3d at 149; Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960–61 (4th Cir. 1996); Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980). Moreover, an employer can set its own performance standards so long as "such standards are not a 'mask' for discrimination." Beall, 130 F.3d at 619; McDougal-Wilson, 427 F. Supp. 2d at 607.

Vaughn's QC Supervisor job description required applicants to have the "ability to supervise and manage complex construction projects and crews as assigned," among numerous other duties such as coordinating with other teams and cooperating with subcontractors. Tschanen Aff., Exs. at 10. Tschanen summarized the QC Supervisor role as "responsible for supervising and directing the quality control efforts at each of the [eight] project sites. This required coordination with the project management team and subcontractors as well as completion of extensive paperwork required by the [Wilson] Project's owner." Tschanen Aff. ¶ 7. The QC Supervisor job required "[s]upervisory experience/training." Tschanen Aff., Exs. at 10. Benson was a temporary employee and the Wilson Project was his first project in the solar industry. See Benson Dep. at 15. Although Benson had been given some increased responsibilities as QC Lead, Benson lacked the required supervisory experience. See id. Thus, even viewing the record in the light most favorable to Benson, Benson

10

has failed to establish the third element of his prima facie case.

As for the fourth element, Benson contends that discrimination can be inferred because Rice and Carmean received the promotion to QC Supervisor over him, and Benson opines that each was less qualified than him. See [D.E. 24] 13–14. However, it is not Benson's perception of his own qualifications that matters. Rather, it is the employer's perception that matters. See King, 328 F.3d at 149; Evans, 80 F.3d at 960–61; Smith, 618 F.2d at 1067.

As for Rice, Benson admits that he "didn't know of any qualifications of Tim Rice." Benson Dep. at 17. In fact, Rice had extensive managerial experience, including running his own company and serving as an operations manager and foreman. See Blair Aff., Exs. at 8–10; Tschanen Aff. ¶ 8. As for Carmean, Vaughn did assign additional responsibilities to Carmean after Rice's termination, but Vaughn did not promote Carmean until February 6, 2017, one month after Benson was terminated. See Tschanen Aff. ¶ 10. Thus, after Rice's termination, there was no QC Supervisor position for which Benson could have applied. In any event, the record reflects Carmean's qualifications for the QC Supervisor position. See Tschanen Aff. ¶ 10; Blair Aff. ¶ 8; Blair Aff., Exs. at 13. Again, it is not Benson's perception of Rice or Carmean's qualification that matters, but Vaughn's perception. See King, 328 F.3d at 149; Bryant v. Bell Atlantic Md., Inc., 288 F.3d 124, 135 (4th Cir. 2002); Hawkins, 203 F.3d at 279–80; Evans, 80 F.3d at 960–61; Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995); Smith, 618 F.2d at 1067. Thus, Benson has not met the fourth element of his prima facie case, and his claims fail. See King, 328 F.3d at 149–50.

Alternatively, even assuming that Benson established a prima facie case, Vaughn had a legitimate and nondiscriminatory explanation for not promoting Benson. See Hicks, 509 U.S. at 509–11; Burdine, 450 U.S. at 254; Evans, 80 F.3d at 960–61. As for Rice's promotion, Rice had

11

extensive managerial experience. See Blair Aff., Exs. at 6–12. As for Carmean's promotion, Carmean also had extensive managerial experience. See Blair Aff., Exs. at 13–15; Tschanen Aff. ¶ 10.

If an employee demonstrates a prima facie case of race discrimination, the employer may rebut that case "by demonstrating that the person promoted was better qualified for the position." Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 189 (4th Cir. 2004); see Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1129–30 (4th Cir. 1995). The employee may then "attempt to prove that the employer's articulated reason for promoting the successful applicant was pretextual." Honor, 383 F.3d at 189; Amirmokri, 60 F.3d at 1129–30. In analyzing pretext, the "crucial issue" is whether "an unlawfully discriminatory motive for a defendant's conduct [exists], not the wisdom or folly of its business judgment." Jiminez v. Mary Washington Coll., 57 F.3d 369, 383 (4th Cir. 1995).

As for Vaughn's explanation for Rice's promotion, Benson contends that it is pretextual because Rice's lack of "electrical experience means he should have been disqualified from the application under [Vaughn's] own rules." [D.E. 24] 14. But a plaintiff's mere speculation about pretext is not enough. See, e.g., Holland, 487 F.3d at 216–18; Mereish, 359 F.3d at 336–39; Hawkins, 203 F.3d at 280–81; Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 444 (4th Cir. 1998), overruled on other grounds by Morgan, 536 U.S. 101. Furthermore, a plaintiff's perception of his own experience, performance, and skills is not relevant. It is the perception of the decisionmaker that counts. See, e.g., King, 328 F.3d at 149; Hawkins, 203 F.3d at 280; Smith, 618 F.2d at 1067; McDougal-Wilson, 427 F. Supp. 2d at 607. Vaughn considered Rice more qualified than Benson, and Benson has not created a genuine issue of material fact. See Blair Aff., Exs. at 13–15.

As for Vaughn's explanation for Carmean's promotion, Benson offers three reasons that it

12

was pretextual: (1) "[I]t is difficult to believe that a company would create a position (QC Supervisor), hire someone for a position (Rice), terminate them within a week, and then not fill the position"; (2) Carmean was "put in charge of QC over [plaintiffs] after Rice was terminated"; and (3) "Rice's 'Supervisor Qualification Checklist' is dated December 20, 2016, prior to Benson's termination on January 6, 2017, showing that [Vaughn] was, in fact, onboarding Carmean prior to Benson's termination." [D.E. 24] 14.

As for the first reason, it is mere speculation, which does not suffice. See, e.g., Holland, 487 F.3d at 216–18; Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006); Mereish, 359 F.3d at 336–39; Hawkins, 203 F.3d at 280–81; Tinsley, 155 F.3d at 444. As for the second reason, Carmean was given increased QC responsibilities after Rice's termination, but he did not receive a promotion or pay increase until one month after Vaughn terminated Benson. See Tschanen Aff. ¶ 10; Blair Aff. ¶ 8; Blair Aff., Exs. 13–15. "It is not . . . the function of this court to second guess the wisdom of business decisions." E.E.O.C. v. Clay Printing Co., 955 F.2d 936, 946 (4th Cir. 1992); see Mereish, 359 F.3d at 339. "Duty-bound though we are to examine employment decisions for unlawful discrimination, we are not cloaked with authority to strip employers of their basic business responsibilities." Hux, 451 F.3d at 315. As for the third reason, a "Supervisor Qualification Checklist" dated December 20, 2016, comports with Carmean assuming increased QC duties after Rice's termination but not being promoted into the role until February 2017. See Blair Aff. ¶ 8; Blair Aff., Exs. 13–15. Again, Benson's speculation does not suffice.

Even viewing the record in the light most favorable to Benson, Benson has failed to create a genuine issue of material fact concerning whether Vaughn's stated reasons for failing to promote Benson were pretexts for illegal discrimination. See Holland, 487 F.3d at 217–18; Hux, 451 F.3d at 317–19; Diamond, 416 F.3d at 319; Anderson, 406 F.3d at 270–73; Honor, 383 F.3d at 189;

Mereish, 359 F.3d at 336–39; Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649–50 (4th Cir. 2002); Dugan v. Albemarle Cty. Sch. Bd., 293 F.3d 716, 722–23 (4th Cir. 2002); Rowe, 233 F.3d at 830; Hawkins, 203 F.3d at 279–80; Causey v. Balog, 162 F.3d 795, 802–03 (4th Cir. 1998); DeJarnette v. Corning, Inc., 133 F.3d 293, 298–300 (4th Cir. 1998); Evans, 80 F.3d at 960–61; Amirmokri, 60 F.3d at 1129–30; Jiminez, 57 F.3d at 383–84; Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987); McDougal-Wilson, 427 F. Supp. 2d at 607–08. Thus, the courts grants summary judgment to Vaughn on Benson's failure to promote claims.

B.

Plaintiffs allege that Vaughn terminated their employment due to their race. See Compl. ¶¶ 41–50, 60–69, 79–88. Under McDonnell Douglas, to establish a prima facie case of termination based on race, a plaintiff must show (1) he is a member of a protected class, (2) he was discharged, (3) he was fulfilling his employer's legitimate expectations at the time of his discharge, and (4) he was treated differently than a similarly situated employee outside the protected class. See, e.g., Goode v. Cent. Va. Legal Aid Soc'y, Inc., 807 F.3d 619, 626 (4th Cir. 2015); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004); Tahir v. Sessions, No. 5:16-CV-781-D, 2017 WL 1735158, at *4 (E.D.N.C. May 2) (unpublished), aff'd, 703 F. App'x 211 (4th Cir. 2017) (per curiam) (unpublished).

As for the first element, each plaintiff is an African American, and thus members of a protected class. See Blair Dec. ¶ 6. As for the second element, Vaughn discharged plaintiffs on January 6, 2017. See id. at ¶¶ 10–11; Benson Dep. at 22; Muhammad Dep. at 10–11; Foster Dep. at 12–13. As for the third element, the court assumes without deciding that plaintiffs were meeting Vaughn's legitimate expectations. As for the fourth element, the parties dispute whether plaintiffs

14

have established the fourth element. Compare [D.E. 21] 9, with [D.E. 24] 6. Although Vaughn appears to have the better argument concerning the fourth element, the court will assume without deciding that plaintiffs have met the fourth element.

The burden shifts to Vaughn to assert legitimate and nondiscriminatory explanation for discharging plaintiffs. See Hicks, 509 U.S. at 509–11; Burdine, 450 U.S. at 254. Vaughn contends that plaintiffs were terminated as part of a larger reduction in force of temporary employees on the Wilson Project. See [D.E. 21] 10; Tschanen Aff. ¶ 4; Blair Aff. ¶ 9. This explanation meets Vaughn's burden of production.

The burden then shifts back to plaintiffs to prove by a preponderance of the evidence that Vaughn's stated reason was a pretext for race discrimination. See, e.g., Hill, 354 F.3d at 285. Plaintiffs can do so by showing the employer's explanation "is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [race] discrimination." Mereish, 359 F.3d at 336; see Reeves., 530 U.S. at 147. Plaintiffs make four arguments concerning pretext: (1) Vaughn terminated Theo Williams a few weeks before plaintiffs, and Williams also had written a statement against Rice; (2) Foster's recruiter at Spencer Ogden told Foster that he was the only Spencer Ogden recruit that was terminated on January 6, 2017; (3) plaintiffs were terminated after only four months of work, but their recruiters had told them that the work would last anywhere from six months to a year; and (4) Vaughn replaced plaintiffs with white employees. See [D.E. 24] 11.

As for the argument concerning Williams's termination, the argument concerns retaliation, not race discrimination and therefore fails. Moreover, Williams was not deposed and did not submit an affidavit. Plaintiffs' speculation concerning Williams's dismissal does not create a genuine issue of material fact. See, e.g., Holland, 487 F.3d at 216–18; Hux, 451 F.3d at 315; Mereish, 359 F.3d at 336–39; Hawkins, 203 F.3d at 280–81; Tinsley, 155 F.3d at 444.

15

As for the Spencer Ogden recruiter's alleged statement that Foster was the only Spencer Ogden employee terminated on January 6, 2017, the statement is hearsay. See Fed. R. Evid. 801(c), 802; cf. Fed. R. Civ. P. 56(c). Furthermore, Vaughn's actions comport with the reduction-in-workforce plan that Vaughn had been instituting in the months before plaintiffs' termination. See Tschanen Aff. ¶ 4; Blair Aff. ¶ 9. Thus, the Spencer Ogden recruiter's alleged statement does not create a genuine issue of material fact. See, e.g., Holland, 487 F.3d at 216–18; Hux, 451 F.3d at 315; Mereish, 359 F.3d at 336–39; Hawkins, 203 F.3d at 280–81; Tinsley, 155 F.3d at 444.

As for the difference between what plaintiffs were told about how long their temporary employment on the Wilson Project would last and how long it actually lasted, plaintiffs were employed at will. Vaughn's decision to discharge numerous temporary employees as part of a reduction in force "is the kind of business decision that [federal courts] are reluctant to second-guess." Rowe, 233 F.3d at 831; see Henson v. Liggett Grp., Inc., 61 F.3d 270, 277 (4th Cir. 1995); Clay Printing Co., 955 F.2d at 946. As mentioned, "[d]uty-bound though we are to examine employment decisions for unlawful discrimination, we are not cloaked with authority to strip employers of their basic business responsibilities." Hux, 451 F.3d at 315. Vaughn retained the discretion to downsize the Wilson Project in accordance with its business needs, and the difference between plaintiffs' expectation of the length of their temporary employment and its actual length does not create a genuine issue of material fact concerning pretext. See id.; Rowe, 233 F.3d at 831; Henson, 61 F.3d at 277; Clay Printing Co., 955 F.2d at 946.

As for plaintiff's contention that white employees replaced them, no evidence supports this contention except Benson's own speculation. See Benson Dep. at 21. Benson's speculation is not enough. See, e.g., Holland, 487 F.3d at 216–18; Hux, 451 F.3d at 315; Mereish, 359 F.3d at 336–39; Hawkins, 203 F.3d at 280–81; Tinsley, 155 F.3d at 444.

16

In addition to disputing the reduction-in-force rationale, Benson and Muhammad also allege that Vaughn already offered another pretextual reason: attendance. See [D.E. 24] 10–11. In support, plaintiffs cite the email from Upchurch to the MCM recruiter stating that Benson and Muhammad were not on site on the date that they were terminated. See Upchurch Dec., Ex. C at 22. In fact, plaintiffs were on site. See Benson Dep. at 22; Muhammad Dep. at 10–11; Foster Dep. at 12–13.

Plaintiffs cannot seek to expose a rationale as pretextual "by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." Hux, 451 F.3d at 315; see Rowe, 233 F.3d at 831. "The former would not create a 'genuine' dispute." Hux, 451 F.3d at 315 (quoting Matsushita Elec. Indus. Co., 475 U.S. at 586–87). The "latter would fail to be 'material.'" Hux, 451 F.3d at 315 (quoting Anderson, 477 U.S. at 248). "[M]ere mistakes of fact are not evidence of unlawful discrimination." Price v. Thompson, 380 F.3d 209, 214 n.1 (4th Cir. 2004), abrogated on other grounds by Foster v. Univ. of Md.-E Shore, 787 F.3d 243 (4th Cir. 2015). After all, a "[p]retext is a lie, not merely a mistake." Id.

As Upchurch's contemporaneous follow-up emails demonstrate, Upchurch's initial email to MCM on January 6, 2017, contained a mistake. See Upchurch Dec., Ex. C. When Upchurch initially sent the email to MCM, Upchurch simply did not know that Benson and Muhammad were working in the warehouse on January 6, 2017. See id. Moreover, on January 4, 2017, Tschanen had sent Upchurch a lengthy list of temporary employees to be terminated (that included plaintiffs) and revised it slightly on January 5, 2017. See Tschanen Aff. ¶¶ 5–6; Tschanen Aff., Exs. at 6–8. No rational jury could rely on the mistake in Upchurch's initial email to find pretext. See, e.g., Hux, 451 F.3d at 315; Price, 380 F.3d at 214 n.1; Dugan, 293 F.3d at 722–23.

17

Plaintiffs disagree with Vaughn's "conclusion as to which positions to eliminate [in the reduction in force], but the ultimate responsibility for that judgment lies with [Vaughn]." Mereish, 359 F.3d at 339. "Our focus is solely on whether this decision was the result of [illegal] bias." Id. Even viewing the record in the light most favorable to plaintiffs, plaintiffs have failed to create a genuine issue of material fact that Vaughn's reason for terminating their employment was pretextual. See Holland, 487 F.3d at 217–18; Hux, 451 F.3d at 317–19; Diamond, 416 F.3d at 319; Anderson, 406 F.3d at 270–73; Honor, 383 F.3d at 189–90; Mereish, 359 F.3d at 336–39; Thompson, 312 F.3d at 649–50; Dugan, 293 F.3d at 722–23; Rowe, 233 F.3d at 830; Hawkins, 203 F.3d at 279–80; Causey, 162 F.3d at 802–03; DeJarnette, 133 F.3d at 298–300; Evans, 80 F.3d at 960–61; Amirmokri, 60 F.3d at 1129–30; Jiminez, 57 F.3d at 383–84; Felty, 818 F.2d at 1128; McDougal-Wilson, 427 F. Supp. 2d at 607–08. Thus, the court grants summary judgment to Vaughn on plaintiffs' termination claims.

C.

Plaintiffs allege that Vaughn terminated their employment in retaliation for participating in the investigation of Rice. See Compl. ¶¶ 51–59, 70–78, 89–97. To establish a prima facie case of retaliation, plaintiffs must prove that (1) they engaged in protected activity under Title VII, (2) their employer took some action against them that a reasonable employee would find materially adverse, and (3) their employer took the adverse action because of the protected activity. See DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015); Boyer-Liberto v. Fontainbleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc); Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–70 (2006). "Retaliation claims . . . require the employee to show that retaliation was a but-for cause of a challenged adverse employment action." Guessous, 828 F.3d at 217 (quotation and citation omitted);

18

see Huckelba v. Deering, No. 5:16-CV-247-D, 2016 WL 6082032, at *3 (E.D.N.C. Oct. 17, 2016) (unpublished). "Naked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation do not state a plausible Title VII claim." Huckelba, 2016 WL 6082032 at *3. Furthermore, the employee must demonstrate temporal proximity between the alleged retaliation and the protected activity. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (per curiam); Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001); Brown v. Wake Cty. Gov., No. 5:16-CV-806, 2017 WL 2982971, at *4 (E.D.N.C. July 12, 2017) (unpublished); Huckelba, 2016 WL 6082032, at *4.

Vaughn concedes that plaintiffs engaged in protected activity when they participated in Vaughn's internal investigation concerning Rice on November 16, 2016, and that terminating their employment on January 6, 2017, was a materially adverse action. See, e.g., White 548 U.S. at 67–70. The court assumes without deciding that the temporal proximity between the participation and the terminations is sufficient for a prima facie case. Cf. Breeden, 532 U.S. at 273–74; Hooven-Lewis, 249 F.3d at 278; Brown, 2017 WL 2982971 at *4; Huckelba, 2016 WL 6082032 *4.

Vaughn has articulated a legitimate non-retaliatory reason for discharging plaintiffs: a larger reduction-in-force of temporary employees as Vaughn began to complete the Wilson Project. See Blair Aff. ¶ 9; Tschanen Aff. ¶ 4; Upchurch Dec. ¶ 8. This explanation meets Vaughn's burden of production. See Hicks, 509 U.S. at 509–11; Burdine, 450 U.S. at 254. Thus, the burden shifts to plaintiffs to prove by a preponderance of the evidence that Vaughn's stated reason for terminating their employment was not its true reason, but a pretext for retaliation. See, e.g., Hill, 354 F.3d at 285. Plaintiffs can do so by showing the employer's explanation "is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." Mereish, 359 F.3d at 336 (quotation omitted); see Reeves, 530 U.S. at 147.

19

Plaintiffs assert the same pretext arguments concerning retaliation as they did for their termination claims. See [D.E. 24] 10–11. The arguments, however, fare no better. Accordingly, because plaintiffs have failed to raise a genuine issue of material fact as to Vaughn's reason for their termination, their retaliation claims fail. See Holland, 487 F.3d at 217–18; Hux, 451 F.3d at 317–19; Anderson, 406 F.3d at 270–73; Honor, 383 F.3d at 189–90; Price, 380 F.3d at 215–17; Mereish, 359 F.3d at 336–39; Love-Lane, 355 F.3d at 788–89; Hill, 354 F.3d at 298–99; King, 328 F.3d at 151–54; Thompson, 312 F.3d at 649–50; Rowe, 233 F.3d at 830; Hawkins, 203 F.3d at 279–80; Causey, 162 F.3d at 802–03; Tinsley, 155 F.3d at 444–45; DeJarnette, 133 F.3d at 298–300; Beall, 130 F.3d at 619–20; Evans, 80 F.3d at 960–61; Amirmokri, 60 F.3d at 1129–30; Jiminez, 57 F.3d at 383–84; Felty, 818 F.2d at 1128. Thus, the court grants summary judgment to Vaughn on plaintiffs' retaliation claims.

## IV.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 20]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 3 1 day of March 2020.

JAMES C. DEVER III<br>
United States District Judge